IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CESAR DAY

            v.

DB CAPITAL GROUP, LLC, et al.

:
:
:   Civil Action No. DKC 10-1658
:
:
:

**MEMORANDUM OPINION**

Presently pending and ready for review in this civil RICO case are the motions to dismiss filed by Defendants Ralph and Tracey Spain (ECF No. 73), Defendant David Murrell (ECF Nos. 45 and 71), Defendant Russell Pettiford (ECF Nos. 53 and 74), Defendant Brian Pettiford (ECF Nos. 55 and 75), Defendants Wachovia Bank, N.A. and Wells Fargo & Company N.A. (ECF Nos. 31 and 72), Defendants Millennium Bank, N.A. and Millennium Bankshares Corporation (ECF Nos. 47 and 70), the motion for leave to file a surreply in opposition to the consolidated motions to dismiss of Defendants Millennium Bank, N.A. and Millennium Bankshares Corporation filed by Plaintiff Cesar Day (ECF No. 83), the motion to dismiss the counterclaims of Defendant/Counter-Plaintiff Tracey Spain filed by Plaintiff/Counter Defendant Cesar Day (ECF No. 84), the motion to intervene filed by JP Morgan Chase Bank, National Association (ECF Nos. 62 and 76), and the motion to dismiss filed by JP

Morgan Chase Bank (ECF No. 89).  The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the following reasons, the motions will be granted in part and denied in part.

I.  **Background**

This case involves an alleged foreclosure rescue scam designed by Defendants and involving properties in Maryland and the District of Columbia.  Plaintiff Cesar Day, an owner of properties in the District of Columbia and Maryland, filed similar suits against the various Defendants in both the Circuit Court for Prince George's County, Maryland and the Superior Court of the District of Columbia.  (Case No. 10-1658, ECF No. 3 and Case No. 10-2166, ECF No. 1-1).[1]  The cases were removed to federal court, and several of the Defendants filed motions to dismiss in both cases.  Subsequently the case pending in the United States District Court for the District of Columbia was transferred to the District of Maryland and consolidated with the already pending case involving the parties.  (ECF No. 64).

_____

[1] The parties' filings in the two cases prior to consolidation were extremely similar when not identical. Necessary filings from the D.C. case have been transferred to the Maryland case.  The entries are in the docket report in chronological order, although not in numerical order.  This memorandum cites generally to the Maryland case docket entries with references to the D.C. case docket where necessary.

## A.  Factual Background

Plaintiff purports to be the victim of the foreclosure rescue scam designed and executed by twelve individual and corporate defendants, acting in concert, to defraud him of the equity in his properties.[2]  The scheme alleged by Plaintiff is similar to those at issue in other recent cases in this district.  *Cf. Proctor, et al. v. Metro. Money Store Corp., et al.*, 579 F.Supp.2d 724, 726 (D.Md. 2008).  In one such case, Judge Messitte summarized the *modus operandi* of such schemes:

> Typically, a homeowner facing foreclosure is identified by a rescuer through foreclosure notices published in the newspapers or at government offices.  The rescuer contacts the homeowner by phone, personal visit, card or flyer, and offers to stop the foreclosure by promising a fresh start through a variety

---

[2] The named Defendants are (1) DB Capital Group, LLC, a Virginia limited liability corporation conducting business in Maryland and the District of Columbia; (2) David Alan Murrell, a resident of Virginia and member/manager of DB Capital Group; (3) Millennium Bank, N.A., a nationally chartered depository banking institution with its principal place of business in Virginia; (4) Millennium Bankshares Corporation, the holding company of Millennium Bank, N.A.; (5) Realty Title of Tysons, Inc., a Virginia corporation conducting real estate settlement services and issuing title insurance; (6) Wachovia Bank, N.A., a nationally chartered depository banking institution; (7) Wells Fargo & Company, N.A., a nationally chartered depository banking institution that purchased and is the successor entity to Wachovia Bank; (8) Brian Pettiford, a resident of Maryland and member/manager of DB Capital Group; (9) Integrity Financial, Inc., a Maryland corporation brokering loans for real estate transactions in Maryland and the District of Columbia; (10) Tracey L. Spain, a resident of Maryland; (11) Ralph D. Spain, a resident of Maryland; and (12) Russell Pettiford, a resident of Maryland.

of devices.  As the date for the foreclosure
approaches and the urgency of the matter
becomes greater, the rescuer or some entity
with which he is linked agrees to arrange
for the pay-off of the mortgage indebtedness
and to see to the transfer of title to the
property to an investor pre-arranged by the
rescuer, often with a leaseback of the
property to the homeowner for a period of
time, occasionally giving him the right to
repurchase the property after the lease
ends.  The rescuer imposes heavy fees or
other charges for his services, in effect
stripping some if not all of the homeowner's
equity, and does all this with little or no
advance notice to the homeowner, who is
usually unrepresented by counsel.

*Johnson, et al. v. Wheeler, et al.*, 492 F.Supp.2d 492, 495-96

(D.Md. 2007)(footnote omitted).

Viewing Plaintiff's complaint in the light most favorable

to him, as the court must when considering motions to dismiss,

the scheme occurred as follows.  Beginning in 2006, Plaintiff

fell behind on the monthly mortgage payments due on a multi-unit

rental property he owned at 1725 29th Street, S.E., Washington,

D.C. ("D.C. Property")(ECF No. 3 ¶ 65).  Plaintiff attempted to

refinance his mortgage loan prior to the beginning of the

foreclosure proceedings, but was unable to do so because of his

poor credit, (*id.* ¶ 66), and foreclosure proceedings were

initiated on the D.C. property in approximately April 2007.

In January 2007, Plaintiff heard an advertisement for

Defendant DB Capital Group LLC ("DB Capital") on radio station

WKYS 93.9 FM wherein DB Capital offered to assist individuals

having problems with bad credit and refinancing to save their properties. (*Id.* ¶¶ 67-68). Plaintiff was prompted by the advertisement to call DB Capital and spoke with Defendant Brian Pettiford. Mr. Pettiford arranged an in-person meeting with Plaintiff at another property owned by Plaintiff located at 3212 Auchentoroly Terrace, Baltimore, Maryland. (*Id.* ¶ 69). A subsequent meeting was set for late January or early February 2007, which took place at Mr. Pettiford's Millennium Bank office located in Vienna, Virginia. At that meeting, Mr. Pettiford allegedly indicated that Millennium Bank, N.A. and DB Capital were the same or related entities and gave Plaintiff a business card identifying himself as the Vice President of the retail/wholesale lending division of Millennium Bank. (*Id.* ¶ 71). During the meeting, Mr. Pettiford also explained the "Foreclosure Reversal Program" to Plaintiff whereby DB Capital could save Plaintiff from foreclosure by assigning a credit investor to purchase his property for a one-year period to allow Plaintiff to repair his credit and repurchase the property with a low interest rate loan after twelve months. Mr. Pettiford also told Plaintiff that in order for the program to work Plaintiff would have to transfer title to all three of the properties he owned: the DC Property facing foreclosure, the Baltimore rental property, and Plaintiff's primary residence at 14932 Nighthawk Lane, Bowie, Maryland. (*Id.* ¶¶ 74-75).

Plaintiff agreed to participate in the program and signed the following documents for all three properties: DB Capital Lease/Purchase; Residential Real Estate Contract by Owner; Authorization; DB Capital Addendum to Contract, Heirs Assignment; DB Capital Group, Inc. Reversal Program/Addendum to Contract to Sell Real Estate; and DB Capital/Reverse Contract. (*Id.* ¶ 80). As Plaintiff understood the Foreclosure Reversal Program, he would be allowed to repurchase the properties within one year (with a 60 day grace period) and he would be added back onto the Deed so that he would resume sole ownership. He also understood that for the next year DB Capital would assist him with repairing his credit, he would be allowed to leaseback all three properties, and DB Capital would make the forthcoming mortgage payments. (*Id.* ¶ 81-82).

Defendants DB Capital, Brian Pettiford, and David Murrell arranged for Defendants Tracey and Ralph Spain and Russell Pettiford to act as the credit investor/straw purchasers for Plaintiff's properties. (*Id.* ¶¶ 83-88). These individuals obtained loans to purchase the property from Defendant Integrity Financial, Inc. ("Integrity"). (*Id.* ¶ 88). Plaintiff alleges that the documentation they submitted to Integrity contained false information regarding the nature of the transactions, the true owners in fact of the properties, and the funds that would be due and payable at settlement by the borrower. (*Id.* ¶ 91).

The credit investors received $10,000 for their participation and were not required to provide any money at the settlement. (*Id.* ¶ 89).

Defendant Realty Title of Tysons, Inc. ("RTS") conducted the real estate settlements and closings for all three of Plaintiff's properties in May 2007, including generating the federally mandated HUD-1 Settlement Statements and Deeds for the properties. (*Id.* ¶¶ 95-111). Although the sale of Plaintiff's properties resulted in substantial net proceeds, this money was transferred to DB Capital rather than Mr. Day. After the closings on Plaintiff's properties, Mr. Murrell set up direct debits from Plaintiff's personal account with Wachovia Bank into the DB Capital account at Wachovia Bank for the rental payments on the properties. (*Id.* ¶ 126).

During the twelve months after the closings, Plaintiff contacted Brian Pettiford on multiple occasions to discuss obtaining financing to repurchase the properties at the end of the one-year period. (*Id.* ¶ 130). Plaintiff never obtained such financing, however, and was not given an opportunity to repurchase the properties. (*Id.* ¶ 132). DB Capital also failed to make the required mortgage payments on the properties, and the DC and Baltimore properties went into foreclosure. (*Id.* ¶ 135).

**B.    Procedural Background**

Plaintiff initially filed suit in the Superior Court of the District of Columbia and the Circuit Court for Prince George's County, Maryland.    The Maryland complaint alleged counts for violations of RICO, fraud or conspiracy to commit fraud, unjust enrichment, negligence, and breach of contract, and sought to obtain a quiet title action, compensatory and punitive damages. (ECF No. 3).    The D.C. complaint contained all those counts in addition to alleging violations of the D.C. Consumer Protection Procedures Act and the D.C. Home Equity Protection Act. (Case No. 10-2166, ECF No. 1-1).[3]    On June 21, 2010, the cases were removed to the United States District Court for the Districts of Columbia and Maryland.    (Case No. 10-1658, ECF No. 1 and Case No. 10-2166, ECF No. 1).    On June 28, 2010, Defendants Tracey and Ralph Spain filed their answer to the Maryland complaint (ECF No. 27) and motions to dismiss for lack of jurisdiction and failure to state a claim in the D.C. case. (Case No. 10-2166, ECF Nos. 9 and 11). Defendants Wachovia Bank, N.A. and Well Fargo & Company NA filed a motion to dismiss in the Maryland case (ECF No. 31) and a motion to transfer the D.C. case to Maryland.    (Case No. 10-2166, ECF No. 27).    On July 21,

---

[3] The complaint in Case No. 10-2166 has been filed in Case No. 10-1658 as ECF No. 97, under the date of September 16, 2010, the date the cases were consolidated.

2010, the motion to transfer the D.C. case to Maryland was granted, and on September 16, 2010 the two cases were consolidated. (ECF No. 64). In the interim, motions to dismiss had been filed by Defendants David Murrell (ECF Nos. 45 and 71); Millennium Bank, N.A. and Millennium Bankshares Corporation (ECF Nos. 47 and 70), Russell Pettiford (ECF Nos. 53 and 74), and Brian Pettiford (ECF Nos. 55 and 75), and answers were filed by Realty Title of Tysons, Inc., (ECF Nos. 42 and 96 Case No. 10-2166 ECF No. 35), DB Capital Group, LLC (ECF No. 43 and Case No. 10-2166 ECF No. 47), and Integrity Financial, Inc. (ECF No. 51 and Case No. 10-2166 ECF No. 45).[4] In addition JP Morgan Chase Bank filed a consent motion to intervene. (ECF Nos. 62 and 76).

Prior to removal of the Maryland case, Defendant Tracey Spain filed a counter and cross-complaint against Mr. Day, Brian Pettiford, DB Capital, Integrity Financial, and RTS in the Circuit Court for Prince George's County. (ECF No. 58). Ms. Spain did not serve Plaintiff or the Defendants with a copy at that time and the pleading was not submitted to this court upon removal. On August 20, 2010, a copy of Ms. Spain's pleading was

---

[4] The answers of Realty Title of Tysons, Inc., DB Capital Group, LLC, and Integrity Financial Inc. have been filed as ECF Nos. 96, 99, and 98 in Case No. 10-1658, again with the date of September 16, 2010.

submitted through CM/ECF by counsel for DB Capital. (ECF No. 57). Plaintiff subsequently moved to dismiss the counterclaims. (ECF No. 84).

## II. Motions to Dismiss

### A. Standard of Review

The purpose of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Nevertheless, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)(internal citations omitted).

In its determination, the court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in

the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999)(citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Iqbal*, 129 S.Ct. at 1950, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). *See also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

**B. Motion to Dismiss Filed by Tracey L. Spain and Ralph D. Spain, Sr.**

Defendants Tracey L. Spain and Ralph D. Spain, Sr. (the "Spains") argue that two of the counts asserted against them, count IV (fraud and civil conspiracy to commit fraud) and count VIII of the D.C. complaint (violation of the District of

Columbia Home Equity Protection Act) should be dismissed because the complaint does not contain sufficient factual matter to support these counts.[5]  (ECF No. 73-1, at 10).

### 1. Fraud and Conspiracy to Commit Fraud

The Spains argue that Plaintiff's complaint lacks sufficient factual allegations to maintain a claim of fraud or conspiracy to commit fraud against them.  (ECF No. 73-1, at 11). The Spains contend that Plaintiff has failed to satisfy the heightened pleading standard for claims of fraud and has not alleged facts to satisfy all of the claim's requisite elements. In particular, the Spains argue that the fraud claim must fail because the complaint contains no allegation that the Spains made any representations to the Plaintiff, true or otherwise, upon which he relied, and the conspiracy claim must fail because the complaint contains only conclusory allegations that the parties had an agreement to conspire and no facts regarding the date, time, or place of such an agreement.  (*Id.* at 11-12).

Plaintiff responds by identifying the Spains' alleged fraudulent statements in the complaint and arguing that it is

---

[5] Defendants Tracey and Ralph Spain filed their motion to dismiss in the D.C. case prior to its transfer and consolidation.  Their initial filing included a motion to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) because the Spains lacked sufficient ties to the District of Columbia.  (ECF No. 73, at 5-9).  Because the case has now been transferred to Maryland, the Spains agree that this portion of their motion is moot.  (ECF No. 81).

immaterial that the Spains never directly spoke with Plaintiff because they are liable for the acts of their co-conspirators. (ECF No. 77, at 7-8). In response to the Spains' arguments regarding the conspiracy claim, Plaintiff maintains that there is no heightened pleading standard for claims of conspiracy and insists that the complaint describes in sufficient detail the common conspiracy in the case and the Spains' role therein. (*Id.* at 5-7).

The elements of fraud in Maryland and the District of Columbia are: "(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation."[6] *Md. Envtl. Trust v. Gaynor*, 370 Md. 89, 97

---

[6] When ruling on state law claims, a United States District Court sitting in Maryland applies Maryland's choice of law rule. *McCoubrey v. Kellog, Krebs & Moran*, 7 F.App'x. 215, 219 (4th Cir. 2001)(citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)). Under Maryland choice of law rules, tort claims are governed by the law of the state where the injury occurred. *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 744 (2000). "The place of injury is the place where the injury was suffered, not where the wrongful act took place." *Id.* (citing *Johnson v.*

(2002); *see also Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977), *cert. denied*, 434 U.S. 1034 (1978).

Claims of fraud are subject to a heightened pleading standard under Fed.R.Civ.P. 9(b). *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783-84 (4th Cir. 1999). Rule 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The word "circumstances" "is interpreted to include the 'time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby.'" *Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F.Supp.2d 298, 313-14 (D.Md. 2000)(quoting *Windsor Assocs. v. Greenfeld*, 564 F.Supp. 273, 280 (D.Md. 1983)). The purposes of Rule 9(b) are to provide the defendant with sufficient notice of the basis for the plaintiff's claim, protect the defendant against frivolous suits, eliminate fraud actions where all of the facts are learned only after discovery, and safeguard the defendant's reputation. *Harrison*, 176 F.3d at 784. In keeping

---

*Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986)). Here the injuries were suffered by Plaintiff in the District of Columbia and Maryland, so the tort law of both jurisdictions tort laws is relevant.

14

with these objectives, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial and (2) that [the] plaintiff has substantial prediscovery evidence of those facts." *Id.*

Here, Plaintiff has failed to plead adequate facts to establish a claim that the Spains are independently liable for fraud. Although the complaint identifies alleged false statements made by the Spains, it does not allege that any of these statements were made to the Plaintiff or that he relied on these false statements. Instead the Spains' alleged false statements were made in loan applications. With no facts to support these key elements of the fraud claim, the claim must be dismissed and it is unnecessary to consider whether the heightened pleading standard of Rule 9(b) has been met.

Turning next to the conspiracy claim, in both Maryland and D.C. conspiracy is not a distinct tort that can sustain an award of damages in the absence of an underlying tort. *Alexander & Alexander, Inc., v. B. Dixon Evander & Assocs.*, 336 Md. 635, 645 (1994)("A conspiracy cannot be made the subject of a civil action unless something is done which, without the conspiracy, would give a right of action."); *see also Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176 (1995); *Exec.*

*Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000)("[C]ivil conspiracy depends on performance of some underlying tortious act")(internal quotations omitted). Instead, "conspiracy acts as an aggravating element of the underlying claim," *Tillery v. Borden*, No. CBD-07-1092, 2010 WL 3517015 (D.Md. Sept. 3, 2010), or "a means of establishing vicarious liability for the underlying tort." *Hill v. Medlantic Health Care Grp.*, 933 A.2d 314, 334 (D.C. 2007)(internal quotations omitted). Thus, while Plaintiff has not stated a claim against the Spains individually for fraud, he may still maintain a claim of conspiracy to commit fraud against them provided that the elements for conspiracy to commit fraud are adequately pleaded and there are adequate facts pleaded to maintain a claim of fraud against the co-conspirators as a group.

The elements of a civil conspiracy are: "1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Exec. Sandwich Shoppe*, 749 A.2d at 738 (internal citation omitted); *Hoffman v. Stamper*, 385 Md. 1, 24 (2005)("we have defined a civil conspiracy as a combination of two or more persons by an agreement or understanding to

16

accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff."). The key question in assessing whether a conspiracy theory has been adequately pleaded is whether there is adequate factual support for the existence of an agreement to conspire. *Brady v. Livingood*, 360 F.Supp.2d 94, 104 (D.D.C. 2004). The "plaintiff must set forth more than just conclusory allegations of [the] agreement." *Id.* The complaint should include factual allegations that provide an indication of when and how the agreement was brokered and how each of the defendants specifically were parties to the agreement. *See Acosta Orellana v. CropLife Int'l*, 711 F.Supp.2d 81, 113-114, (D.D.C. 2010). In *Acosta*, the court dismissed a civil conspiracy claim because the plaintiff had failed to provide any factual support that the defendant CropLife had an agreement with the other defendants and found that it was just as likely that they were acting independently with a common motivation or goal. *Id.* at 114. The court explained "the plaintiffs' amended complaint paints a maze from which it cannot be discerned with whom the plaintiffs are alleging the CropLife Defendants conspired, when the alleged agreement was reached, and what particular activity was the object of the conspiracy." *Id.*

Here, however, Plaintiff's complaint contains more detail. It specifically indicates the parties that are alleged to have conspired and references specific instances when the Spains met with and communicated with other members of the alleged conspiracy, namely Brian Pettiford and David Murrell on behalf of DB Capital, and Integrity. The complaint alleges that the Spains signed contracts for purchase of Plaintiff's Maryland properties at the request of DB Capital representatives and then submitted false documentation to Integrity and that they received $10,000 for their participation in the foreclosure rescue scam. (ECF No. 3 ¶¶ 83-89). These allegations provide an adequate factual basis to make it not merely possible, but indeed plausible, that the Spains were part of the conspiracy to defraud.

In addition, Plaintiff has adequately pleaded a case of fraud against members of the conspiracy. In particular Plaintiff identifies a number of allegedly fraudulent statements that were made by Defendant Brian Pettiford on behalf of DB Capital during his meetings with Plaintiff in early 2007. (*See, e.g.,* ECF No. 3 ¶¶ 67-68, 71-81, and 195). For example, Mr. Pettiford allegedly told Plaintiff that he would only need to transfer his properties for a year, that during that period DB Capital would work to repair his credit and help him obtain a low interest loan to repurchase his property, and that lenders

only look at applicant's credit history for the prior year. (*Id.*). Plaintiff's complaint alleges that the Defendants made these and other statements with knowledge of their falsity and with the intention of motivating Plaintiff to sign over title to his properties, and that he did rely on the statements. (*Id.* ¶¶ 78-79, 85-89, and 196-200). Plaintiff's complaint also identifies the specific harm that he suffered. Overall, the combination of these allegations satisfies the pleading requirements for fraud.

Accordingly, at this stage in the litigation the Spains' motion to dismiss will not be granted with respect to the conspiracy to commit fraud claim.

### 2. District of Columbia Home Equity Protection Act

In count VIII of the D.C. complaint, the Spains are alleged to have violated the District of Columbia Home Equity Protection Act, D.C. Code § 42-2432 (2010). This statute creates civil liability for individuals who "engage in, arrange, offer, promote, promise, solicit participation in, or carry out a foreclosure rescue transaction in the District or concerning residential property in the District." § 42-2432(a).

The Spains argue that they cannot be liable under this Act for three reasons: (1) the Act did not become effective until January 29, 2008, which is after the events which gave rise to the lawsuit occurred, and the Act does not have retroactive

effect; (2) Plaintiff has not alleged that the Spains engaged in any acts involving real estate in the District of Columbia—the properties for which they are the alleged straw purchasers are located in Maryland; and (3) Plaintiff is not a "homeowner" as the term is used in the Act and thus not entitled to relief therein. (ECF No. 73-1, at 12-14).

Plaintiff counters that even if the Act is not interpreted to have retroactive effect, the activities that form the basis of his complaint took place from April 2007 until May 2008 and the Spains can be held liable for their participation in the scheme from the Act's effective date, January 29, 2008 through May 2008. (ECF No. 77, at 9). Plaintiff also argues that the Spains can be held liable even if they did not personally purchase homes in the District of Columbia because they were part of a common conspiracy that engaged in foreclosure services in the District. (*Id.* at 10). Finally Plaintiff argues that the term "homeowner" should be interpreted to refer to all record owners of residential property regardless of whether it is their primary residence. (*Id.*).

As the parties note, the Act is a recent statute, and there is no case law interpreting its meaning yet, but there is a general presumption against giving laws retroactive effect absent express language. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). This presumption has been embraced by

courts in the District of Columbia when interpreting District of Columbia statutes. *See, e.g., Holzsager v. District of Columbia Alcoholic Beverage Control Bd.*, 979 A.2d 52 (D.C. 2009). If there is no "express command" to apply the statute to conduct arising before its enactment and doing so would affect the substantive rights, liabilities, or duties of individuals, then the statute should only apply prospectively. *Lytes v. DC Water & Sewer Auth.*, 572 F.3d 936, 939-40 (D.C. Cir. 2009).

The Home Equity Protection Act does not expressly provide for retroactive effect, and its provisions presumably impose new liability for conduct that arguably was previously permissible. Thus, Plaintiff cannot invoke its protections for conduct occurring prior to the Act's effective date of January 29, 2008.

Plaintiff attempts to maneuver around this limitation by arguing that the foreclosure rescue scheme was intended to provide for services lasting through April or May 2008 and the Spains' participation in the transaction thus lasted until May 2008. (ECF No. 77, at 9). This argument has some merit given that the Act's prohibitions include "engage[ing] in . . . or carry[ing] out a foreclosure rescue transaction in the District or concerning residential property in the District", except for the fact that Plaintiff has not alleged any facts to connect the Spains to the D.C. property at issue in the case. The Spains' only alleged participation in the DB Capital foreclosure rescue

program was their role as credit investors for the two Maryland properties. (ECF No. 3 ¶¶ 84-89). The only affirmative action the Spains allegedly took was to submit documentation to Defendant Integrity to secure loans to purchase the Maryland properties and sign the contracts for purchase of the Maryland properties in 2007. (*Id.*). There are no alleged facts to connect their actions to the D.C. property at any time. And although Plaintiff argues in his opposition that the Spains can be held liable under the D.C. statute because they were part of the conspiracy that "engaged" in the foreclosure rescue scam in D.C., (ECF No. 77, at 10), Plaintiff has not pleaded adequate facts to support this assertion.

In sum, Plaintiff has not alleged sufficient facts to maintain a claim against the Spains for violation of the D.C. Home Equity Protection Act.

### C. Motions to Dismiss Filed by David Murrell, Brian Pettiford and Russell Pettiford

The complaint alleges the following against Defendants David Murrell, Brian Pettiford, and Russell Pettiford: count I, violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a); count II, violation of RICO, § 1962(c); count III, violation of RICO § 1962(d); count IV, fraud and conspiracy to commit fraud; count V, unjust enrichment; count VII, breach of contract, rescission,

unconscionability, and failure of consideration; and count VIII of the D.C. complaint, violation of the D.C. Home Equity Protection Act, D.C. Code § 42-2431. Brian Pettiford and Russell Pettiford are also identified with respect to count VIII of the Maryland complaint and count X of the D.C. complaint seeking a declaratory judgment/quiet title action. In addition, David Murrell and Brian Pettiford are alleged to have violated the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3904. Finally, all three are allegedly liable for punitive damages. While each of these Defendants filed a separate motion, they are represented by the same counsel and there is significant overlap in their arguments. To the extent there are common issues to all three motions they will be discussed together.

As an initial matter all three Defendants argue that the complaint lacks factual allegations specifically directed toward their individual actions. David Murrell and Brian Pettiford argue that to the extent the complaint references actions and decisions made by DB Capital they are not personally liable. (ECF No. 45, at 6, 8, 9). Russell Pettiford argues that the complaint consists of only a few factual allegations that mention him and that none of these indicate that he personally committed any act which was harmful to Plaintiff. (ECF No. 54, at 13). Plaintiff responds by arguing that as members of the

conspiracy the defendants can be held liable for the acts of their co-conspirators even if they would not be liable individually and that an individual member of a limited liability company, such as DB Capital, may be held liable for torts he or she personally commits or directs even if they are performed in the name of the LLC. (ECF No. 69, at 5).

As discussed above, Plaintiff is correct that where a conspiracy has been adequately pleaded, individual members of the conspiracy can be held liable for actions taken by co-conspirators. In addition, under Maryland and D.C. law, the limited liability company form does not operate to shield individual members from liability "for torts he or she personally commits, or which he or she inspires or participates in, even though performed in the name of an artificial body." *Allen v. Dackman*, 413 Md. 132, 153 (2010)(internal quotations omitted). "An individual may also be liable despite limitations on his or her liability when he or she 'is present on a daily basis during commission of the tort and gives direct orders that cause commission of the tort.'" *Id.; see also Luna v. A.E. Eng'g Servs., LLC*, 938 A.2d 744, 748 (D.C. 2007)(applying to an LLC member the "general rule . . . that corporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation"); *McFarland v. Va. Ret. Servs. of Chesterfield,*

24

*LLC*, 477 F.Supp.2d 727, 739-40 (E.D.Va. 2007)(applying rule to LLC incorporated in Virginia). Accordingly the creation of the DB Capital entity will not preclude David Murrell and Brian Pettiford from liability where the complaint alleges facts to show that they personally committed, inspired, or directed the tortious acts. In addition, to the extent that Plaintiff has pleaded adequate facts that Defendant Russell Pettiford was a participant in the conspiracy, like the Spains, he can be held liable for the tortious acts of his co-conspirators.

The claims against these Defendants cannot be dismissed wholesale; instead each count must be considered individually.

### 1. Fraud or Conspiracy to Commit Fraud

First, all three Defendants contend that Plaintiff has failed to allege fraud or conspiracy to commit fraud with adequate specificity to satisfy the heightened pleading standard of Rule 9(b). Foremost, Defendants David Murrell and Russell Pettiford argue that Plaintiff has failed to allege that any statements were made by them to Plaintiff to induce him to take any action. (ECF No. 45, at 10 and ECF No. 54, at 15). Plaintiff counters that he has described in detail the fraudulent statements that the Defendants made and their participation in the scheme. (ECF No. 67-1, at 23; ECF No. 69-1, at 17).

The requirements for stating a claim of fraud or conspiracy have already been discussed, as has Plaintiff's satisfactory pleading of a claim of fraud against the members of the reverse foreclosure scheme. Generally these Defendants' arguments suffer from the same flaws. Plaintiff has explained how David Murrell, Brian Pettiford and Russell Pettiford were involved in the scheme and thus, he has adequately pleaded a conspiracy. Accordingly the fraud claims will not be dismissed at this time.

## 2. RICO Violations

Plaintiff has asserted claims against the Defendants under RICO subsections (a)[7], (c)[8], and (d).[9] 18 U.S.C. §§ 1962(a),(c), and (d). To state a claim for a substantive violation of RICO,

---

[7] Subsection (a) "is aimed at the use of racketeering proceeds to infiltrate an enterprise." *Benard v. Hoff*, 727 F.Supp. 211, 214 (D.Md. 1989). The elements of subsection (a) claim are: (1) a receipt of income from a pattern of racketeering activity, and (2) use or investment of this income in an enterprise. 18 U.S.C. § 1962(a); *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837 (4th Cir. 1990).

[8] Subsection (c) "is aimed at the use of an enterprise to carry out racketeering activities." *Benard*, 727 F.Supp. at 214. The elements of a subsection (b) claim are: (1) conduct of or participation in (2) any enterprise (3) through a pattern (4) of racketeering activity. 18 U.S.C. § 1962(c); *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

[9] Subsection (d) is aimed at conspiracies to violate subsections (a) through (c) of RICO. 18 U.S.C. § 1962(d). To allege a subsection (d) claim, plaintiff must allege that "each defendant agreed that another coconspirator would commit two or more acts of racketeering." *United States v. Pryba*, 900 F.2d 748, 760 (4th Cir.), *cert. denied*, 498 U.S. 924. (1990).

the complaint must set forth facts which, if proven, would establish "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989)(quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, (1985)). Several of the operative terms are defined by statute. "Enterprise," as set forth by 18 U.S.C. § 1961(4), "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The same statute defines "racketeering activity," in relevant portion, as "any act which is indictable" under a number of enumerated criminal provisions. *Id.* § 1961(1). A "pattern of racketeering activity," moreover, "requires at least two acts of racketeering activity, one of which occurred after the effective date of [RICO] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." *Id.* § 1961(5).

Plaintiff alleges that the predicate acts committed by the Defendants are proscribed by the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, listed in RICO § 1961(1)(B). The elements of mail fraud are (1) a scheme disclosing an intent to defraud, and (2) the use of the mails in furtherance of the scheme." *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996)(explaining the elements of mail fraud under 18

U.S.C. § 1341). Wire fraud is similar, except that "wire, radio, or television," rather than the mails, provides the means to further the fraud. 18 U.S.C. § 1343. In the context of a RICO action, the mailings or wirings do not have to contain the misrepresentations that defrauded the plaintiff, but must merely be in furtherance of the fraudulent, material misrepresentation upon which the plaintiff justifiably relies to his or her detriment. *Chisolm,* 94 F.3d at 337; *see also In re Am. Honda Motor Co. Dealerships Litig.*, 941 F.Supp. 528, 546, n.19 (D.Md. 1996)(stating that "a mailing need only be a necessary step in furtherance of a scheme, and need not be fraudulent in and of itself").

Defendants argue that Plaintiff has failed to plead a sufficient factual basis for the underlying offenses of wire and mail fraud and that Plaintiff has failed to establish a "pattern of racketeering activity." (ECF No. 54, at 14). The sufficiency of Plaintiff's fraud claims has already been addressed. In addition, Plaintiff has pleaded the use of the mail and bank wire transactions in furtherance of the scheme. (ECF No. 3 ¶¶ 30, 46-47, 112, 114, 119, 121, 123, and 125). Whether Plaintiff has alleged adequate facts to demonstrate that there was a pattern of racketeering activity requires additional analysis.

To allege a pattern of racketeering activity, a plaintiff must show that at least two predicate acts occurred within ten years of each other, 18 U.S.C. § 1961(5), that the acts were related, and that they "amount to or pose a threat of continued criminal activity," *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989). Acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (quoting *Sedima*, 473 U.S. at 496, n.14). With respect to the continuity element, the Fourth Circuit has explained:

> Continuity . . . refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." [*H.J. Inc.*, 492 U.S. at 242](emphasis added). To satisfy the continuity element, a plaintiff must show that "the predicates themselves amount to, or . . . otherwise constitute a threat of, continuing racketeering activity." *Id.* at [240](emphasis in original). Significantly, "[p]redicate acts extending over a few weeks or months threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with longterm criminal conduct." *Id.* at [242]. . . . Thus, predicate acts must be part of a prolonged criminal endeavor.

*Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683-84 (4th Cir. 1989). The Fourth Circuit has also expressed reservations about RICO claims where the predicate acts are mail and wire fraud "because

it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001)(quoting *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000)). RICO liability is reserved for "ongoing unlawful activities whose scope and persistence pose a special threat to social wellbeing." *Id.* (quoting *Menasco*, 886 F.2d at 684). The Fourth Circuit accordingly found the continuity prong unsatisfied in *Menasco* where the defendants' actions were narrowly directed toward a single fraudulent goal, involved one perpetrator, one set of victims, and the transaction took place over one year, and in *Flip Mortgage Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988), where the allegations presented a series of events as part of a single scheme perpetrated by defendants against a single victim.

Here, Plaintiff has alleged with specificity facts relating to his participation in the scheme. Although Plaintiff owned three properties that he sold as part of the foreclosure rescue scam, considering these separately to count at least two predicate acts runs counter to the rulings in the *Menasco* and *Flip Mortgage*. Plaintiff's complaint contains additional allegations regarding other victims of Defendants' scheme, however, (*see* ECF No. 3 ¶ 144), and asserts that the enterprise "operated for at least 2 years and targeted dozens of properties

in Maryland." (*Id.* ¶ 147). To add further support to his allegations, Plaintiff has attached a copy of the complaint from a separate case involving an alleged foreclosure rescue scam with Defendant Brian Pettiford filed in this court. (*See* ECF No. 67 at 14, n.2 and Ex. 1). Although not a part of the alleged facts in his complaint, in reviewing a Rule 12(b)(6) dismissal, the court may properly take judicial notice of matters of public record, such as public court filings. *See, e.g., Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). While ultimately, Plaintiff will need significantly more proof to establish RICO violations, he has pled adequate facts for the RICO claims to proceed based on a pattern of racketeering activity.

In addition to alleging a RICO violation for a pattern of racketeering activity, Plaintiff also alleged RICO claims based on the "the collection of unlawful debt." For RICO claims based on the collection of unlawful debt, the prevailing view is that the plaintiff need not show a pattern of such activity—one act of collection is sufficient. *See United States v. Weiner*, 3 F.3d 17, 24 (1st Cir. 1993)(observing that "there is no counterpart definition of a 'pattern of collection of unlawful debt,' as one would expect if such a pattern were an element of one of RICO's core provisions"); *United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir. 1991)("Unlike a 'pattern of

racketeering activity' which requires proof of two or more predicate acts, to satisfy RICO's 'collection of unlawful debt' definition the government need only demonstrate a single collection."); *United States v. Pepe*, 747 F.2d 632, 645 (11th Cir. 1987); *United States v. Tocco*, 200 F.3d 401, 426 (6th Cir. 2000); *United States v. Eufrasio*, 935 F.2d 553, 576 (3d Cir.), *cert. denied*, *Idone v. United States*, 502 U.S. 925 (1991); *see also United States v. Oreto*, 37 F.3d 739, 751-52 (1st Cir. 1994), *cert. denied*, 513 U.S. 1177 (1995). The Fourth Circuit has not formally adopted this interpretation, but district courts within the circuit have embraced the view.[10] *See, e.g., Proctor v. Metro. Money Store Corp.*, 645 F.Supp.2d 464, 481 (D.Md. 2009); *Eyler v. 3 Vista Court LLC*, No. RWT 07cv2383, 2008 WL 4844962 (D.Md. Aug. 26, 2008).

There are at least eight elements to a successful claim under RICO for collection of an unlawful debt:

> (1) there was a RICO enterprise, (2) its activities affected interstate commerce, (3) the individual defendants were employed by or associated with the enterprise, (4) the defendants used, in the operation of the enterprise, income derived from collection of unlawful debt, (5) the individual defendants participated in the conduct of the affairs of the enterprise through collection of unlawful debt, (6) the debt was unenforceable in whole or in part

---

[10] For a detailed analysis in support of this view *see United States v. Weiner*, 3 F.3d 17, 24 (1st Cir. 1993).

> because of state or federal laws relating to
> usury, (7) the debt was incurred in
> connection with the business of lending
> money at a usurious rate, and (8) the
> usurious rate was at least twice the
> enforceable rate.

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank,* 755 F.2d 239,

248 (2d Cir.)(citing 18 U.S.C. §§ 1962(a), 1961(6) and 1964(c)),

*cert denied*, *Durante Bros. & Sons, Inc. v. Nat'l Bank of New*

*York* City, 473 U.S. 906 (1985). Many of these elements overlap

with those for other RICO claims. They key additional

requirement is simply the allegation of a collection unlawful

debt and the use of proceeds from that collection to further the

enterprise. Under RICO, an "unlawful debt" is defined as a debt

that is:

> (A) ... unenforceable under State or Federal
> law in whole or in part as to the principal
> or interest because of the laws relating to
> usury, and (B) which was incurred in
> connection with ... the business of lending
> money or a thing of value at a rate usurious
> under State or Federal law, where the
> usurious rate is at least twice the
> enforceable rate.

18 U.S.C. § 1962(6).

Plaintiff's alleged RICO violation for collection of

unlawful debt follows the logic of similar allegations made in

*Proctor*. The essence of the argument is that the sale-leaseback

provision that characterized the foreclosure rescue scheme:

> constitutes a mortgage loan under Maryland
> law such that the allegedly high interest

33

> rates charged by Defendants constitute the
> collection of an 'unlawful debt' under
> Maryland law because the loans made to the
> named plaintiff[ ] . . . are alleged to be
> in excess of twice the usury limit in
> Maryland, and plaintiffs were required to
> repay these loans at the end of one year or
> they would be evicted from their homes as
> their equitable mortgage would be
> foreclosed.

*Proctor*, 645 F.Supp.2d at 482.

In his opposition to the motions to dismiss, Plaintiff identifies only two paragraphs from the complaint that contain the substance of his allegations with respect to the collection of unlawful debt.

> 158. Each of the transactions concerned
> herein also involved the collection of
> "unlawful debts," as defined by RICO, §1961
> (6). These transactions were unenforceable
> under applicable State law, in whole or in
> part as to principal or interest because of
> the laws relating to usury, and these debts
> were incurred in connection with the
> business of lending money and/or things of
> value at a rate usurious under applicable
> State law.
>
> 159. The enforceable rate of each of these
> loans to Plaintiff was no more than 6% per
> annum, and each of the three transactions
> involving the Plaintiff involved equitable
> mortgages which carried an annual percentage
> rate far in excess of that amount.

(ECF No. 3). Plaintiff's complaint does not provide the specific interest rates that were charged for loans, information that should be within the Plaintiff's possession, or otherwise allege any specific facts to show how the loans were above the

usury limit and thereby unlawful. Thus at present Plaintiff has not stated a RICO claim for the collection of an unlawful debt and the RICO counts cannot proceed on this basis unless Plaintiff amends his complaint.

### 3. Breach of Contract Claims

The complaint alleges that David Murrell, Brian Pettiford, and Russell Pettiford are liable in count VII for breach of contract, rescission, unconscionability, or failure of consideration. The Defendants argue that no portion of count VII has been adequately pleaded. Defendant Russell Pettiford argues that Plaintiff has failed to identify the contract between Plaintiff and himself and that Plaintiff admits he received full compensation from Mr. Pettiford for the sale of the D.C. property, rendering the failure of consideration claim untenable. (ECF No. 54, at 20). Perplexingly with respect to the unconscionability claim, Russell Pettiford argues that he is "unaware of any causable cause of action recognized in Maryland for 'unconscionability,'" (*id.* at 19), and then proceeds to cite cases outlining the requirements for a claim of unconscionability under Maryland law. (*Id.* at 20)(citing *Doyle v. Finance America*, 173 Md.App. 370 (2007)). In addition, he argues that Plaintiff failed to plead that the terms of the contract were unconscionable. (*Id.*). Defendant Brian Pettiford

relies on the arguments made by Russell Pettiford (ECF No. 51, at 4).

Defendant David Murrell argues that the breach of contract count must be dismissed against him because he was not party to any contractual agreements with Plaintiff; the party to the contract was Defendant DB Capital. (ECF No. 49, at 12). Plaintiff argues in response that he has alleged that Defendants Brian Pettiford, Russell Pettiford, and David Murrell along with DB Capital had an agreement with him whereby he would transfer ownership of his properties for one year. (ECF No. 69, at 22; ECF No. 67, at 28).

Despite Plaintiff's claims to the contrary in his oppositions to the motions to dismiss, the allegations of the complaint reference only agreements between Plaintiff and Defendant DB Capital and the contracts for the sale of his properties to Tracey and Ralph Spain and Russell Pettiford. (*See* ECF No. 3 ¶¶ 80, 84, 88, 220). Two basic tenets of law then apply to shield the other Defendants from liability for breach of contract. First and foremost is the general rule that "a person cannot be held liable under a contract to which he was not a party." *Snider Bros., Inc. v. Heft*, 271 Md. 409, 414 (1974). Secondly, members of a limited liability company are not "personally liable for the obligations of the company, whether arising in contract, tort, or otherwise, solely by

reason of being a member of the limited liability company." Md. Code Ann., Corporations and Ass'ns, § 4A-301 (2010); *see also* Va. Code Ann. § 13.1-10.19 (2010)("no member, manager, organizer or other agent of a limited liability company shall have any personal obligation for any liabilities of a limited liability company, whether such liabilities arise in contract, tort or otherwise, solely by reason of being a member, manager, organizer or agent of a limited liability company."). Although, as discussed above, the law allows for the imposition of personal liability in tort for LLC members who are directly involved in, direct, or control the tortious activity, there is no analogous rule for contract-based actions. Thus, Defendants David Murrell and Brian Pettiford cannot be held personally liable for the contractual obligations of DB Capital. Because Plaintiff has not adequately pleaded the existence of any contracts that David Murrell or Brian Pettiford signed in their individual capacity, the breach of contract claims against them will be dismissed.

Plaintiff does allege, however, that Russell Pettiford knowingly agreed to execute a contract for sale and various other documents associated with the reverse foreclosure transaction. (ECF No. 3 ¶ 56). While the complaint does not specifically state the contract for sale was between Russell Pettiford and Plaintiff, that is a reasonable inference from the

other alleged facts.   If the other elements of the contract claims are adequately pleaded, Plaintiff may maintain count VII against Russell Pettiford.

### a.   Breach of contract

To state a claim for breach of contract, a plaintiff must plead the existence of a contractual obligation owed by the defendant to the plaintiff and a material breach of that obligation.  *RRC Ne., LLC v. BAA Md., Inc.*, 413 Md. 638, 658 (2010).[11]  Here Plaintiff has pleaded the existence of a contract between himself and Russell Pettiford and that Mr. Pettiford breached the contract by failing to transfer back ownership of the D.C. property after one year.   (ECF No. 3 ¶ 221).   These allegations are sufficient to maintain the breach of contract claim.

---

[11] As an initial matter it is unclear what law might apply to the alleged contract for sale between Plaintiff and Russell Pettiford.  "Maryland applies the law of the jurisdiction where the contract was made to matters regarding the validity and interpretation of contract provisions, and a contract is made where the last act necessary to make the contract binding occurs."  *Riesett v. W.B. Doner & Co.*, 293 F.3d 164, 173 n.5 (4th Cir. 2002)(internal citations omitted).   Plaintiff has alleged that he signed the agreements at issue in late January or February of 2007 at Brian Pettiford's office in Vienna, VA. (ECF No. 3 ¶ 80).   The complaint does not allege facts to indicate where Russell Pettiford signed the contract, however, or whether it contained a choice of law provision.  Because both parties reference Maryland contract law in their motions, the court will assume for the time being that Maryland contract law will govern.

**b.   Rescission**

Turning next to the rescission claim, Plaintiff has pleaded that the fraudulent misrepresentations of Defendants warrant rescission of the deeds transferring title to the properties.  A contract may be rescinded where there is fraud, duress or undue influence, or the equities otherwise permit*. Janusz v. Gilliam*, 404 Md. 524, 535 (2008).  Here Plaintiff has pleaded that the contracts for sale of his properties were induced by fraud, and, thus, he has stated a claim for rescission.

**c.   Failure of Consideration**

Plaintiff also alleges failure of consideration. Ordinarily "contracts . . . require consideration to be enforceable."  *Harford Cnty. v. Town of Bel Air*, 348 Md. 363, 381-82 (1998)(citing *Beall v. Beall*, 291 Md. 224, 229 (1981)). Failure of consideration occurs where a contract is made, but because of some supervening cause, the promised performance fails.  3 Williston on Contracts § 7:11 (4th ed. 2010). Plaintiff alleges that because he did not receive full value for the sale of his D.C. property to Russell Pettiford the contract can be nullified.  (ECF No. 67-1, at 29)(citing Compl. ¶¶ 56 and 228).  These allegations are adequate to maintain a claim of failure of consideration against Russell Pettiford.

**d. Unconscionability**

Finally, Plaintiff alleges that the real estate contracts were unconscionable and unenforceable. An unconscionable contract is one "characterized by extreme unfairness, which is made evident by (1) one party's lack of meaningful choice and (2) contractual terms that unreasonably favor the other party." *Walther v. Sovereign Bank*, 386 Md. 412, 425 (2005)(quoting Black's Law Dictionary 1560 (8th ed. 2004)). In Maryland and elsewhere the prevailing view is that both procedural and substantive unconscionability must be present for a court to invalidate a contract or clause under the doctrine of unconscionability. *Holloman v. Circuit City Stores*, Inc., 391 Md. 580, 603 (2006). Procedural unconscionability focuses on the bargaining process that led to the formation of the contract and "looks much like fraud or duress." *Freedman v. Comcast Corp.*, 190 Md. App. 179, 208 (quoting *Walther*, 386 Md. at 426), *cert*. denied, 415 Md. 39 (2010). Substantive unconscionability "involves those one-sided terms of a contract from which a party seeks relief. *Walther*, 386 Md. at 427.

Plaintiff argues that he has pleaded procedural unconscionability by alleging facts that identify the unequal bargaining power and sophistication level between himself and the individuals at DB Capital and also that fraudulent misrepresentations prompted him to agree to the contract.

40

(ECF No. 67-1, at 30-31)(citing Compl. ¶¶ 223-26, 235).
Plaintiff also maintains that the complaint identifies
unconscionable terms in the contract, such as the fact that
there was no possible way under its terms for Plaintiff to buy
back his properties after a year. (*Id.* at 32). Plaintiff has
pleaded sufficient facts to maintain his claim that the
contracts for sale were unconscionable.

### 4. Unjust Enrichment

In addition to the contract claims, Plaintiff has also
alleged that Defendants are liable for unjust enrichment. The
Defendants argue that Plaintiff cannot maintain a claim of
unjust enrichment against them because he has pleaded the
existence of several written agreements and unjust enrichment is
only available when there is no express or implied contract.
(ECF No. 54 at 17-19). Plaintiff counters that the claim of
unjust enrichment can be maintained because he has alleged that
the failure of consideration rendered the contract void.
(ECF No. 67-1, at 26-27).

Both parties miss the broader point that the Federal Rules
permit pleading in the alternative. Federal Rule of Civil
Procedure 8(d)(3) provides that "[a] party may state as many
separate claims or defenses as it has, regardless of
consistency." In applying this rule, courts have held that
parties may plead inconsistent facts and inconsistent legal

theories. 5 Charles Alan Wright and Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1283 (3d ed.)(2010). While ultimately plaintiff may be unable to recover under both his unjust enrichment and breach of contract claims, he may continue to pursue them both at this time. In addition because a claim of unjust enrichment does not require a contract, Plaintiff may continue to pursue this claim against David Murrell and Brian Pettiford as well as DB Capital.

### 5. District of Columbia Home Equity Protection Act

Plaintiff has alleged that Brian and Russell Pettiford and David Murrell violated the D.C. Home Equity Protection Act, D.C. Code § 42-2431, *et. seq.*, by participating in the foreclosure rescue transaction. Defendants argue that the claim must be dismissed because Plaintiff is not a "homeowner" as defined in the statute because Plaintiff's D.C. property was for rental income and not owner-occupied. (ECF No. 74, Mem. at 2). Plaintiff disputes this interpretation of homeowner in the statute and argues that because is the "record owner" of residential property, he is protected by the statute. (ECF No. 67-1, at 22).

In contrast to Defendants Tracey and Ralph Spain, Plaintiff has alleged that the Pettifords were involved in the transfer of the D.C. property and thus they may have "engaged in or arranged," a "foreclosure rescue transaction in the District or

42

concerning residential property in the District" in violation of the Act.  *See* D.C. Code § 42-2432.  But the question of whether Plaintiff constitutes a homeowner as defined by the act remains. Because the issue has not been thoroughly briefed by the parties and the D.C. courts have not yet had an opportunity to interpret and apply the statute, this court will not dismiss this claim as to the Pettifords at this time.

### 6.  Action to Quiet Title

Defendants Brian and Russell Pettiford also seek to dismiss Plaintiff's declaratory judgment/quiet title action against them.  The thrust of Defendants' argument is that the Maryland Code only permits an individual to maintain an action to quiet title if he is "in actual peaceable possession of property" or in "constructive and peaceable possession" of "vacant and unoccupied property" and Plaintiff has failed to plead either circumstance.  (ECF No. 54, at 21-22).  Plaintiff responds that he did retain possession of the properties and that the deed in question functioned as an equitable mortgage rather than absolute transfer of title.  (ECF No. 67-1, at 33-34).

In their briefing both parties have overlooked the fact that the property for which the Pettifords currently hold title is located in the District of Columbia and not Maryland.  It is a firmly established principle that questions involving interests in land are governed by the law of the *situs*.  *See*

43

Restatement (2nd) of Conflict of Laws, Ch. 9, Topic 2, Introductory Note (1971). Thus, Maryland code provisions on actions to quiet title are irrelevant, and D.C. law will govern.

The D.C. code does not set forth any specific procedures or requirement for actions to quiet title that are not based on a claim of adverse possession. *See In re Tyree*, 493 A.2d 314, n.3 (D.C. 1985). D.C. courts have established, however, that "an action to quiet title may not be dismissed for failure to state a claim when the complaint alleges . . . that the plaintiffs are the owners of the land in fee simple." *Id.* at 317.

The claim will not be dismissed at this time.

**7. District of Columbia Consumer Protection Procedures Act**

Plaintiff has alleged that Defendants Brian Pettiford and David Murrell violated the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3904 ("CPPA"). The CPPA includes 34 subsections, only five of which are referenced in the Complaint.[12] The CPPA "affords a panoply of strong

_____

[12] The Complaint quotes from subsections (a), (e), (f), (r), and (gg) without specific citation. Those subsections provide as follows:

        It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:
        (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics,

44

remedies, including treble damages, punitive damages, and attorneys' fees, to consumers who are victimized by unlawful trade practices." *Ford v. ChartOne, Inc.*, 908 A.2d 72, 80-81

---

ingredients, uses, benefits, or quantities that they do not have;

(e) misrepresent as to a material fact which has a tendency to mislead;

(f) fail to state a material fact if such failure tends to mislead;

(r) make or enforce unconscionable terms or provisions of sales or leases; in applying this subsection, consideration shall be given to the following, and other factors:

(1) knowledge by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer;

(2) knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased;

(3) gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees;

(4) that the person contracted for or received separate charges for insurance with respect to credit sales with the effect of making the sales, considered as a whole, unconscionable; and

(5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors;

(gg) violate any provision of the Home Equity Protection Act of 2007 [Chapter 24A of Title 42].

(D.C. 2006). The general thrust of Plaintiff's allegations is that Defendants David Murrell and Brian Pettiford knowingly misrepresented or omitted material facts when convincing Plaintiff to participate in their foreclosure rescue scam. (ECF No. 97 ¶ 234).

Defendant David Murrell does not address this count specifically in his motion to dismiss and relies only on his general argument that Plaintiff has not pleaded sufficient facts to hold him individually liable for any of the counts. (ECF No. 71). Defendant Brian Pettiford argues that the statute is inapplicable to this case because Plaintiff does not meet the definition of a "consumer" who is entitled to protection under the CPPA. Mr. Pettiford further explains that because the D.C. property was used by Plaintiff for commercial leasing and not as his primary residence, he cannot recover under the Act. (ECF No. 75 ¶ 11).

Plaintiff argues in response that the CPPA does apply because one of the properties at issue was his personal residence and that he does qualify as a consumer under the statute because he is someone "who receives consumer goods or services." And he argues that the Defendants have cited no case law holding that a consumer cannot bring an action under the Act because he owns rental properties. (ECF No. 65, at 11).

The CPPA defines consumer as "a person who does or would purchase, lease (from), or receive consumer goods or services, including a co-obligor or surety, or a person who does or would provide the economic demand for a trade practice." D.C. Code § 28-3901(a)(2). When used as an adjective "'consumer' describes anything, without exception, which is primarily for personal, household, or family use." *Id.* D.C. courts have interpreted this language to preclude recovery under the CPPA by individuals or organizations whose purchases or transactions were motivated by business or commercial purposes. *See, e.g., Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*, 700 F.Supp. 588, 591 (D.D.C. 1988)(holding that cab driver's purchase of gasoline was not covered by CPPA because it was made in connection with his role as an independent businessman). Elaborating on the meaning of the statute, the D.C. Court of Appeals explained:

> the relevant distinction is one between retail and wholesale transactions. Transactions along the distribution chain that do not involve the ultimate retail customer are not "consumer transactions" that the Act seeks to reach. Rather, it is the ultimate retail transaction between the final distributor and the individual member of the consuming public that the Act covers. Accordingly, it is not the use to which the purchaser ultimately puts the goods or services, but rather the nature of the purchaser that determines the nature of the transaction. If the purchaser is regularly engaged in the business of buying the goods or service in question for later resale to another in the distribution chain, or at

> retail to the general public, then a
> transaction in the course of that business
> is not within the Act. If, on the other
> hand, the purchaser is not engaged in the
> regular business of purchasing this type of
> goods or service and reselling it, then the
> transaction will usually fall within the
> Act.

*Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. 1989).

The circumstances of Plaintiff's reliance on DB Capital's foreclosure rescue services present somewhat of a hybrid situation. Although Plaintiff did not intend to resell the services, they were meant to help him maintain ownership of a property he used to earn rental income. In that way, this case is similar to the situation presented in *Mazanderan* where although the cab driver did not intend to resell the gasoline, it was purchased to support his commercial business activities. Plaintiff attempts to shift the analysis by arguing that DB Capital's services were intended to help him maintain ownership of his personal residence in Maryland as well. But the facts as alleged make clear that it was Plaintiff's risk of foreclosure on his D.C. property, used for rental income, that initially motivated him to contact DB Capital. Moreover, the CPPA does not provide a cause of action for violations that occur outside of the District of Columbia. Under these circumstances,

Plaintiff does not constitute a consumer under the CPPA and Plaintiff's CPPA claims will be dismissed.

### D. Motions to Dismiss Filed by Wachovia Bank, Wells Fargo & Company, and Millennium Bank

Defendants Wachovia Bank, N.A. and Wells Fargo & Company, N.A., (collectively "Wachovia Bank")[13] and Defendants Millennium Bank, N.A. and Millennium Bankshares Corporation (collectively "Millennium Bank") filed motions to dismiss all the counts asserted against them. (ECF Nos. 31, 47, 70, and 72). Because the banks are alleged to have played analogous roles in the foreclosure rescue scam, were identified in the same two counts (count VI (negligence) and count XI (punitive damages)), and raise the same arguments in their papers, their motions will be addressed together.

Defendants Wachovia Bank and Millennium Bank are allegedly liable for negligence under a *respondeat superior* theory of liability. Defendants David Murrell and Brian Pettiford were employees of Wachovia and Millennium respectively and are alleged to have conducted aspects of the scheme from their places of employment. Wachovia and Millennium Bank argue that the claims against them should be dismissed, however, because

---

[13] Wachovia Bank, N.A. merged into Wells Fargo Bank, N.A. on March 20, 2010. Wachovia is now a division of Wells Fargo Bank, N.A. which in turn is a wholly owned subsidiary of Well Fargo & Company. (ECF No. 31, at n.1).

the factual allegations are insufficient to support the *respondeat superior* claim. (ECF No. 72-1, at 2; ECF No. 32, at 2; ECF No. 47, at 1). Defendants argue that the misconduct of Mr. Pettiford and Mr. Murrell was clearly outside the scope of their employment with the banks because they were not acting to further any interests of the banks. (ECF No. 32, at 2, 7-8; ECF No. 47, at 5-6)). In addition, the banks argue that the claim for punitive damages against them must be dismissed because punitive damages cannot be awarded for claims of ordinary negligence. (ECF No. 32, at 8; ECF No. 47, at 2, 7).

Defendant Wells Fargo & Company raises the additional argument that even if Wachovia Bank is vicariously liable for Mr. Murrell's conduct, Wells Fargo & Company would be shielded from liability by virtue of its corporate status. (ECF No. 32, at 10).

Plaintiff counters that the complaint alleges an adequate basis to establish *respondeat superior* liability for Wachovia and Millennium Banks based on the actions of their employees. (ECF No. 68, at 6-12; ECF No. 66-1, at 3-4, 7-14). Plaintiff maintains that the types of activities Mr. Murrell and Mr. Pettiford conducted as part of the foreclosure rescue scheme were identical to the types of activities they conducted as employees of the banks, including setting up bank accounts and dealing with deposits, (ECF No. 68, at 8; ECF No. 66-1, at 7-

12), and that their actions were beneficial to the banks because they brought them additional business. (ECF No. 68, at 11; ECF No. 66-1, at 13). Plaintiff also notes that Defendants have failed to address the allegation that the banks are directly liable for negligent supervision irrespective of the outcome of the *respondeat superior* claim. (ECF No. 68, at 13; ECF No. 66-1, at 15). Additionally, Plaintiff argues that Maryland law allows for the imposition of punitive damages against an employer based on the intentional acts of its employees. (ECF No. 68, at 16; ECF No. 66-1, at 16-17). Finally, Plaintiff argues that there are documents and other evidence to indicate that Wells Fargo and Wachovia are the same entity, but if Defendants are correct regarding their corporate structure, Plaintiff should be allowed to amend his complaint to substitute Well Fargo Bank, N.A. for Wells Fargo & Company, N.A. (ECF No. 68, at 16-18).

The doctrine of *respondeat superior* allows an employer to be held vicariously liable for the tortious conduct of its employee when that employee was acting within the scope of the employment relationship. *Dhanraj v. Potomac Elec. Power Co.*, 305 Md. 623, 627 (1986); *see also Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 29 (D.C. 1979). "To be within the scope of the employment the conduct must be of the kind the servant is employed to perform and must occur during a period not

unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master." *E. Coast Freight Lines v. Mayor of Baltimore*, 190 Md. 256, 285 (1948); *see also Sawyer v. Humphries*, 322 Md. 247, 255 (1991). Many factors are considered, including:

> (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result[;] and (j) whether or not the act is seriously criminal.

*Sawyer*, 322 Md. at 256 (internal quotations omitted)(incorporating factors from First Restatement of Agency § 229). The *Sawyer* court continued to note that an additional factor is "whether the employee's conduct was expectable or foreseeable" and reiterated that in cases of employees committing intentional torts "where an employee's actions are

52

personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests, even if during normal duty hours and at an authorized locality, the employee's actions are outside the scope of his employment." *Id.*

The parties' briefs cite primarily to cases considering the applicability of *respondeat superior* liability in factual circumstances entirely unlike the one here. For example, Plaintiff cites cases where employers were found liable for sexual or physical assaults carried out by security guards or school counselors. (*See* ECF No. 66-1, at 10-11). These cases are not especially enlightening given the facts of this case.

Other courts have considered whether to hold banks vicariously liable for the fraudulent or otherwise tortious or illegal conduct of their employees. One such case is *Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*, 298 F.3d 768, 771-72 (9th Cir. 2002), where the United States Court of Appeals for the Ninth Circuit considered whether to impose *respondeat superior* liability on Wells Fargo bank for the RICO violations of its employees where one of its branch tellers had used her position to orchestrate the financial affairs of a RICO conspiracy. The complaint included allegations strikingly similar to those made against the banks in this case including: "that Wells Fargo was liable because it reaped benefits from

[the employee's] activities by 'obtaining numerous new accounts and receiving millions of dollars in deposits'" and that the employee "committed her crimes 'while acting within the course and scope of her employment ... using the training, offices, and other instrumentalities of her employment.'" *Id.* at 772. The Ninth Circuit held that these actions were not within the course of her employment at Wells Fargo and did not render Wells Fargo liable for actions committed by the RICO defendants. *Id.* The Ninth Circuit proclaimed that "conspiring to violate RICO was outside the course and scope of Tran's employment . . . [and] was well beyond her job description as a bank teller." *Id.* at 777. In addition the Ninth Circuit expressed concern that extending the *respondeat superior* theory of liability in situations like that would have the effect of making employers liable for the conduct of non-employee RICO co-conspirators over whom the employer had no control or ability to monitor and thereby "demolish the equitable balance the doctrine of *respondeat superior* seeks to achieve." *Id.*

In order to determine whether the facts alleged are adequate to maintain a *respondeat superior* theory, the specific acts of Mr. Murrell and Mr. Pettiford that allegedly were conducted within the scope of their employment must be considered. Beginning with Wachovia Bank and Mr. Murrell, Plaintiff has alleged that Mr. Murrell would recruit credit

investors for the foreclosure rescue scheme from depositors and other customers of Wachovia (ECF No. 3 ¶¶ 6, 16), and would identify Wachovia customers at risk of foreclosure to participate in the program. (*Id.* ¶ 24). Plaintiff also alleges that DB Capital, the entity that managed and ran the scheme, maintained a bank account with Wachovia that was managed by Mr. Murrell and that Mr. Murrell arranged for funds to be transferred from Plaintiff's account at Wachovia to DB Capital's account as part of the scheme. More generally, Plaintiff alleges that Mr. Murrell utilized Wachovia "to conduct the business of DB Capital including calling participants to monitor rental payments, sending facsimiles and other electronic data, and setting up DB Capital bank accounts into which the illegal proceeds of Defendants' scam would be deposited and distributed from." (*Id.* ¶ 123).

With respect to Mr. Pettiford's work at Millennium Bank, Plaintiff alleges that Mr. Pettiford used his position as a Vice-President at Millennium Bank to recruit property owners in need of financial assistance to participate in the scheme and customers with good credit seeking to acquire a loan or refinance to act as straw purchasers in the scam. (ECF No. 3

¶¶ 25-26).[14]    Plaintiff also alleges that he met with Mr.
Pettiford at his office at Millennium Bank during normal work
hours to discuss the details of Plaintiff's participation in the
program and Mr. Pettiford allegedly indicated that the
Millennium Bank and DB Capital were the same or related
entities.    (*Id.* ¶¶ 71-73).    And Plaintiff alleges that Mr.
Pettiford used his office at Millennium to "sign necessary
paperwork and agreements, run credit checks, and otherwise
conduct the business of DB Capital." (*Id.* ¶ 62).

Plaintiff has not alleged sufficient facts to maintain
negligence claims against Wachovia or Millennium Bank under a
*respondeat superior* theory.    Plaintiff has alleged only that
Defendants Murrell and Pettiford conducted acts relating to the
DB Capital foreclosure rescue scam from their offices at
Wachovia and Millennium Bank and during business hours and that
their actions may have had the incidental effect of obtaining a
few extra customers for the banks.    Plaintiff has not alleged

---

[14]   In his opposition to the motion to dismiss, Plaintiff
argues that Defendant Tracey Spain is an example of a Millennium
bank customer who was recruited to participate in the scam in
just this fashion.    (ECF No. 66-1, at 7-8).    The details
regarding Ms. Spain's relationship to Millennium Bank are
included in Ms. Spain's counterclaims, however, and Plaintiff
would need to amend his complaint to make this allegation part
of his claim.    Moreover, the fact that one credit investor was
recruited by Defendant DB Capital from Millennium Bank's
customer base is not adequate to impose *respondeat superior*
liability on the bank.

any facts to indicate that Mr. Murrell or Mr. Pettiford were motivated by a desire to benefit their employers.

While acknowledging that the complaint does not include specific facts alleging that Mr. Murrell was acting to further Wachovia's interests, Plaintiff argues that he satisfied his burden by alleging that Mr. Murrell "was acting within the scope of his employment with Wachovia." (ECF No. 69, at 10). According to Plaintiff, this allegation "incorporates the legal meaning of the phrase which, by definition, includes actions taken at least in part, to further the interests of an employer" and as such he "need not incorporate into his pleading the elements of proof required in order to prevail on this claim." (*Id.*). Under the pleading standards set forth in *Twombly* and *Iqbal*, however, Plaintiff's allegations are insufficient. The allegation that Mr. Murrell was acting within the scope of his employment is precisely the sort of "naked assertion devoid of further factual enhancement" or "formulaic recitation of the elements of a cause of action" that is not permissible. *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)(internal citations omitted).

Plaintiff maintains that the complaint also alleges that the banks are directly liable because of their negligent supervision of Mr. Murrell and Mr. Pettiford. (ECF No. 68-1,

at 13-14).[15]  To establish liability for negligent supervision a plaintiff must show that his or her injury was caused by the tortious conduct of an employee, the employer knew or should have known that the employee was capable of inflicting harm of some type, the employer failed to use proper care in supervising that employee, and the employer's breach was the proximate cause of the plaintiff's injury.  *See Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F.Supp. 720, 751 (D.Md. 1996). Plaintiff's complaint contains only the bare legal assertion that the banks failed to supervise properly Defendants Murrell and Pettiford without specific factual allegations to support this assertion.  The complaint contains no allegations that the banks were aware of Mr. Murrell or Mr. Pettiford's participation

---

[15] In its reply brief, Millennium Bank argues that Plaintiff cannot assert claims for negligent supervision and negligence based on *respondeat superior* liability in the same count and thus if Plaintiff's complaint is construed to contain a separate count of negligent supervision it must fail for duplicity. (ECF No. 78, at 8).  Plaintiff filed a motion for leave to file a surreply to address this argument on October 26, 2010, twenty-two days after Defendant's reply was filed.  (ECF No. 83).  As Plaintiff notes, surreply are not permitted as a matter of course in this district; pursuant to Local Rule 105.2(a) leave of court is necessary in order to file surreply.  Reply briefs are typically due fourteen days after service of opposition briefs.  Local Rule 105.2(a).  Plaintiff's motion for leave to file a surreply was thus untimely and Plaintiff offered no explanation or justification for his delay in filing. Accordingly Plaintiff's motion for leave to file a surreply will not be granted.  Because the court finds both theories of negligence deficient, it is not necessary to consider Millennium Bank's duplicity argument.

in the scheme or any indication of the type and level of supervision the banks conducted or how it was deficient. Plaintiff has not stated a claim for negligent supervision.

Because Plaintiff has failed to plead adequately any basis by which the banks are liable for negligence, Plaintiff's claim for punitive damages from the banks in count XI also fails. *See, e.g., Montgomery Ward & Co., Inc. v. Keulemans*, 275 Md. 441 (1975)(holding that there must be an award of compensatory damages for an award of punitive damages to stand). All claims against the banks will be dismissed.

### III. Motion to Intervene

JP Morgan Chase Bank, N.A. ("Chase") filed a consent motion to intervene pursuant to Fed.R.Civ.P. 24 on September 13, 2010 (ECF Nos. 62 and 76). Chase contends that it has an interest in the case because it acquired a Deed of Trust that First Magnus Financial Corporation had acquired on one of the properties at issue in the case, 1729 29th Street, S.E., Washington, D.C. from Defendants Brian and Russell Pettiford. (ECF No. 62-1, at 2). Chase further argues that because Plaintiff's quiet title action seeks to adjudicate the validity of the Pettiford's interest in the D.C. property, the outcome of the case will impact Chase's interest in the subject property and without allowing Chase to participate its interest will not be protected. (*Id.* at 3).

Federal Rule of Civil Procedure 24 permits anyone to intervene in an action upon timely application. The Rule distinguishes between intervention as of right pursuant to Rule 24(a), and permissive intervention pursuant to Rule 24(b). Rule 24(a)(2) states as follows:

> On timely motion, the court must permit anyone to intervene who: . . . (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

The Fourth Circuit has explained that an intervenor under Rule 24(a)(2) must satisfy four requirements: (1) the intervenor must submit a timely motion; (2) it must demonstrate a "direct and substantial interest" in the property or transaction; (3) it must prove that the interest would be impaired if the intervention was not allowed; and (4) it must establish that the interest is inadequately represented by existing parties. *In re Richman*, 104 F.3d 654, 659 (4th Cir. 1997)(citing *In re Kaiser Steel Corp.*, 998 F.2d 783, 790 (10th Cir. 1993)); *see also In re Thompson*, 965 F.2d 1136, 1142 (1st Cir. 1992). "An application to intervene should be viewed on the pleadings, and in considering whether a party should intervene in a case, a court should not be concerned with whether the applicant is likely to prevail on the merits." *First Penn-Pacific Life Ins. Co. v.*

*William R. Evans, Chartered*, 200 F.R.D. 532, 536 (D.Md. 2001)(citing *Williams & Humbert Ltd. v. W. & H. Trade Marks Ltd.*, 840 F.2d 72, 75 (D.C. Cir. 1988)

The permissive intervention of a third party to an action is governed by Fed.R.Civ.P. 24(b), which provides as follows in relevant part:

> On timely motion, the court may permit anyone to intervene who: . . . (b) has a claim or defense that shares with the main action a common question of law or fact. . . . In exercising its discretion the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Permissive intervention primarily lies at the discretion of the court. *See Hill v. W. Elec. Co.,* 672 F.2d 381, 385 (4th Cir.), *cert. denied,* 459 U.S. 981 (1982).

Here, Chase has established that intervention is warranted under both Fed.R.Civ.P 24(a)(2) and 24(b). As an initial matter, Chase's motion is timely as it was filed before discovery has begun and before several of the Defendants have filed their answers. By virtue of its acquisition of the First Magnus Deed of Trust, Chase has a direct interest in the D.C. property at issue in this case. Because the quiet title action in the complaint seeks to void any Deeds of Trust on the D.C. property, the outcome of the case will impact and potentially impair Chase's interests in that property, and there are no

current parties to the case that can protect Chase's interests. Accordingly, Chase's intervention must be permitted pursuant to Rule 24(a)(2) and the motion will be granted.

## IV.   Motion to Dismiss Filed By JP Morgan Chase Bank

While its motion to intervene was pending, Chase filed a motion to dismiss the quiet title action relating to the property at 1729 29th Street, SE, Washington, DC. (ECF No. 89). By way of argument, Chase incorporates the motions to dismiss filed by Defendants Russell and Brian Pettiford. (ECF No. 89-1, at 2).  As discussed above the Pettifords' motion to dismiss the quiet title action count will be denied.  For the same reasons, Chase's motion will be denied.

## V.   Motion to Dismiss Counterclaims Filed by Plaintiff Cesar Day

Tracey Spain filed a counter-complaint in the Maryland case prior to removal that asserted three counts against Plaintiff—two for fraud and one for unjust enrichment relating to Plaintiff's Baltimore property.  (ECF No. 58).  Plaintiff moves to dismiss these counterclaims for improper service and/or failure to state a claim.  (ECF No. 84).

Plaintiff's initial argument is that the claims should be dismissed because he was not properly served.  Ms. Spain filed her counter and cross claims with the Circuit Court for Prince George's County prior to removal but did not serve a copy on

Plaintiff or her co-defendants. When the case was removed, a copy of the pleading was not initially provided to the court. In August 2010, counsel for Defendants DB Capital, David Murrell, Russell Pettiford, and Brian Pettiford, recognized that this pleading was missing from the CM/ECF docket and submitted a copy "to perfect the record." (ECF No. 57). Mr. Day alleges he first learned of the counterclaim at that time and argues that this does not constitute proper service. Ms. Spain concedes that she did not serve Mr. Day with her countercomplaint when it was filed in Prince George's County. (ECF No. 85, at 2 and ECF No. 93). She contends, however, that "it was served through CM/ECF service when the case was removed to this court [and] any problems with service were cured by Mr. Day's filing of his motion to dismiss."[16] (ECF No. 85, at 2).

Irrespective of whether proper procedures were followed in state court or at the time of removal, Ms. Spain's counterclaims and cross claims were definitively made a part of the district court record on August 23, 2010 and copies were provided to all parties electronically. The counterclaims will not be dismissed for improper service and all parties have twenty-one days from the date of the order accompanying this memorandum opinion to

---

[16] None of the Defendants identified in Ms. Spain's cross-claims have filed answers or other responses to the cross-claims.

file answers or other responses.  Because Plaintiff has already raised substantive challenges to Ms. Spain's counterclaims, the court will consider those now.

### A. Fraud Counts

Ms. Spain has alleged two counts of fraud against Plaintiff—one seeking rescission of the deed transferring title to the Baltimore property (count I) and one seeking damages (count II).  Plaintiff argues that both should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because Ms. Spain has not plead sufficient facts to establish a claim of fraud.  In particular, Plaintiff argues that there is no allegation that he made any representations directly to Ms. Spain, let alone any fraudulent representations on which she may have relied, and that she has failed to meet the elevated pleading requirement for fraud pursuant to Fed.R.Civ.P. 9(b)  (ECF No. 84, at 5). Plaintiff contends that Ms. Spain was fully aware of the nature of the transaction and nothing was concealed from her.  (*Id.* at 10).  In response Ms. Spain argues that Mr. Day knew that the Baltimore property was not worth $280,000, he knew that Ms. Spain did not seek to purchase the property for $280,000 with a fourteen percent interest rate, and he knew that by signing the Deed and loan documents he was not really transferring ownership to her, yet he signed the Deed containing these representations. (ECF No. 85, at 4-5).

The elements of fraud have already been discussed at length. To recap, under Maryland law a plaintiff must prove: "(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation." *Md. Envtl. Trust v. Gaynor*, 370 Md. 89, 97 (2002).

Plaintiff primarily argues that Ms. Spain has failed to plead adequate facts to satisfy elements one and four. With respect to element one, the alleged fraudulent representation(s) identified by Ms. Spain in her counterclaims are statements in the Deed signed by Plaintiff. (ECF No. 58 ¶¶ 39, 52). Ms. Spain does not identify the specific statements or portions of the deed that she contends are false, nor does she allege that Plaintiff himself drafted the deed or otherwise was responsible for its contents or that he directly communicated these representations to her. With respect to element four, Ms. Spain also never alleges that she relied on any statements made by Plaintiff. Instead she alleges that she agreed to participate in the program "acting on Mr. Pettiford's advice and counsel,"

(ECF No. 58 ¶ 14), and that she signed documents at Mr. Pettiford's and RTS's direction. (*Id.* ¶ 22).

Ms. Spain's counterclaims do not contain adequate facts to establish elements one and four of fraud. And unlike Plaintiff, Ms. Spain has not alleged a conspiracy to commit fraud involving Plaintiff and Mr. Pettiford or other Defendants that would allow her to use their collective acts to establish fraud. Accordingly, the fraud counts as to Mr. Day will be dismissed.

### B. Unjust Enrichment

In count IV of her counterclaims, Ms. Spain asserts a claim for unjust enrichment against Plaintiff. (ECF No. 58 ¶¶ 63-71). In Maryland, a claim of unjust enrichment consists of three elements: (1) the plaintiff confers a benefit upon the defendant, (2) the defendant knows or appreciates the benefit, and (3) the defendant accepts or retains the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007).

Plaintiff argues the unjust enrichment claim should be dismissed because he did not receive any benefit from Ms. Spain. (ECF No. 84, at 11). Ms. Spain has alleged that by taking out a higher than fair market value mortgage on the Baltimore property, she conferred on Plaintiff the benefit of being relieved from his loans and foreclosure on the property as well

as the benefit of rental income from his tenants in the property for two years. (ECF No. 85, at 6; ECF No. 58 ¶ 66). Plaintiff disputes these allegations and maintains that he lost title to and equity in his Baltimore property while Ms. Spain received $10,000 for her participation in the program and that the rent Ms. Spain alleges he received actually went to DB Capital. (ECF No. 84, at 12).

Plaintiff's argument is not that Ms. Spain has failed to allege the requisite elements of unjust enrichment but rather that her allegations are false. In ruling on a 12(b)(6) motion, the court must consider all well-pled allegations as true and construe them in the light most favorable to the non-moving party. The court cannot evaluate the merits of the parties' respective pleadings or make factual determinations. On its face, Ms. Spain's pleading states a claim for unjust enrichment against Mr. Day and accordingly the motion to dismiss this count will be denied.

## VI. Conclusion

For the foregoing reasons, the motion by Defendants Tracey and Ralph Spain to dismiss will be granted in part and denied in part; the motion by Defendant David Murrell to dismiss will be granted in part and denied in part; the motion by Defendant Russell Pettiford to dismiss will be denied; the motion by Defendant Brian Pettiford to dismiss will be granted in part and

denied in part; the motion by Defendants Wachovia Bank, NA. and Wells Fargo & Company, N.A. to dismiss will be granted; the motion by Defendants Millennium Bank, N.A. and Millennium Bankshares Corporation to dismiss will be granted; the motion by Plaintiff Cesar Day for leave to file a surreply will be denied; the motion by JP Morgan Chase Bank to intervene will be granted; the motion by JP Morgan Chase Bank to dismiss will be denied; and the motion by Plaintiff Cesar Day to dismiss Tracey Spain's counterclaims will be granted in part and denied in part.

A separate Order will follow.


                                        /s/
              _____
                              DEBORAH K. CHASANOW
                              United States District Judge